UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

U.S. DIST. COURT CLERK
EAST DIST. MICH
FLINT

2008 MAY -5 ⊃ 4: 43

**FILED**

MAY 14 2008

Clerk, U.S. District and
Bankruptcy Courts

**FILED**

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

v.

GREGORY N. McKNIGHT, and
LEGISI HOLDINGS, LLC,

Defendants,

and

LEGISI MARKETING, INC., LIDO
CONSULTING, LLC
HEALTHY BODY NUTRACEUTICALS,
LINDENWOOD ENTERPRISES, LLC,
DANIELLE BURTON, THERESA
BURTON, and JENNIFER MCKNIGHT,

Relief Defendants.

CIVIL ACTION No.  08-11887

HON. PAUL V. GADOLA

Case: 1:08-mc-00307
Assigned To : Unassigned
Assign. Date  5/15/2008
Description: miscellaneous

## ORDER APPOINTING RECEIVER

On the basis of the Plaintiff, United States Securities and Exchange Commission's

("Commission") Emergency *Ex Parte* Motion for the Appointment of a Receiver, the Court

having been advised in the premises and having considered the materials before it:

**IT IS HEREBY ORDERED THAT:**

The Court appoints Robert D. Gordon of Clark Hill, PLC, 500 Woodward Avenue,

Suite 3500, Detroit Michigan, as Receiver, without bond, for 1) the estate of defendant Gregory

Fee Pd
$39 ⁰⁰

N. McKnight ("McKnight"), and 2) the estates of every corporation, partnership, trust and/or

other entity (regardless of form) which is directly or indirectly owned by or under the direct or

indirect control of McKnight.  The entities directly or indirectly owned by or under the direct or

indirect control of McKnight in this matter include, but are not limited to, Defendant Legisi

Holdings, LLC ("Legisi Holdings") and Entity Relief Defendants Legisi Marketing, Inc. ("Legisi

Marketing"), Lido Consulting, LLC ("Lido"), Healthy Body Nutraceuticals ("HBN"), and

Lindenwood Enterprises, LLC ("Lindenwood").  The estates for which Gorder is hereby

appointed Receiver are hereinafter referred to as the "Receiver Estates."

**IT IS FURTHER ORDERED THAT:**

**I.**

The Receiver shall have the following powers and duties:

A.    To use reasonable efforts to determine the nature, location and value of all assets

and property which the Receiver Estates own, possess, have a beneficial interest in, or control;

B.    To engage and employ the law firm of Clark Hill, PLC and, with the approval of

the Court, any individuals or entities the Receiver deems necessary to assist in his duties

("Retained Personnel");

C.    To take custody, control and possession of all the funds, property, premises,

leases, and other assets of or in the possession or under the direct or indirect control of the

Receiver Estates, to manage, control, operate and maintain the Receiver Estates, to use income,

earnings, rents and profits of the Receiver Estates, with full power to sue for and collect, recover,

receive and take into possession all goods, chattels, rights, credits, monies, effects, lands, books

and records of accounts and other papers of the Receiver Estates;

2

D.   To bring such legal actions based on law or equity in any state, federal, or foreign court as he deems necessary or appropriate in discharging his duties as Receiver;

E.   To pursue, resist and defend all suits, actions, claims and demands which may now be pending or which may be brought by or asserted against the Receiver Estates;

F.   To make such payments and disbursements from the funds so taken into his custody, control and possession or thereafter received, and to incur such expenses as may be necessary or advisable in the ordinary course of business in discharging his duties as Receiver;

G.   Take such action as necessary and appropriate to prevent the dissipation or concealment of any funds or assets or for the preservation of any such funds and assets of the Receiver Estates;

H.   Have the authority to issue subpoenas to compel testimony of persons or production of records, consistent with the Federal Rules of Civil Procedure and the Local Rules for the United States District Court for the Eastern District of Michigan concerning any subject matter relating to the identification, preservation, collection and/or liquidation of the Receiver Estates;

I.   To take any action which could be taken by the officers, directors, partners, members, and trustees of the Receiver Estates;

J.   To suspend, terminate or grant a leave of absence to any employees of the Receiver Estates; and

K.   To take such other action as may be approved by this Court.

**II.**

3

The Receiver and Retained Personnel are entitled to reasonable compensation and expense reimbursement from the Receiver Estates. Such compensation shall be in amounts commensurate with the services performed by the Receiver and Retained Personnel and shall be subject to the approval of the Court. The Receiver and Retained Personnel shall apply to the Court for such compensation and expense reimbursement monthly. The Commission shall have the opportunity to review and, at its sole discretion, object to any application of the Receiver and Retained Personnel for compensation. Amounts paid to the Receiver and Retained Personnel shall be paid from the assets frozen by the Court's Order dated this same date ("Asset Freeze Order"), and any extensions, renewals or modifications thereof.

## III.

The Receiver shall not be required to post bond or give an undertaking of any type in connection with his fiduciary duties and obligations in this matter unless and until this Court so orders.

## IV.

The Receiver and Retained Personnel are entitled to rely on all outstanding rules of law and Court orders and shall not be liable to anyone for their own good faith compliance with any order, rule, law, judgment, or decree. In no event shall the Receiver or Retained Personnel be liable to anyone for their good faith compliance with their duties and responsibilities as Receiver or Retained Personnel, nor shall the Receiver or Retained Personnel be liable to anyone for any actions taken or omitted by them except upon a finding by this Court that they acted or failed to act as a result of malfeasance, bad faith, gross negligence, or in reckless disregard of their duties.

4

## V.

The Receiver shall establish one or more bank account(s), in his discretion, to deposit the Receiver Estates' frozen funds and any other funds the Receiver may recover. The Receiver shall use such funds for any legitimate purpose consistent with the Receiver's powers and duties and this Order, including paying fees and expenses of the Receiver and Retained Personnel, as approved by the Court.

## VI.

The Defendants, the Entity Relief Defendants and Danielle Burton, Theresa Burton and Jennifer McKnight (the "Individual Relief Defendants" ) are required to assist the Receiver in fulfilling his duties and obligations. As such, they must respond promptly and truthfully to all requests for information and documents from the Receiver. However, this requirement does not impinge on the Defendants', Entity Relief Defendants', and Individual Relief Defendants' rights to assert any applicable privilege.

## VII.

All investors, creditors, and other persons, and all others acting on behalf of any such investor, creditor or other persons, including sheriffs, marshals, other officers, deputies, servants, agents, employees and attorneys, are stayed from:

    A.   Commencing, prosecuting, continuing or enforcing any suit or proceeding against or affecting any of the defendants or any of the Receiver Estates;

    B.   Using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any

5

assets of the Receiver Estates, including, without limitation, any property owned by or in the possession of the defendants or the Receiver, wherever situated;

C.   Attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement with the defendants or otherwise affecting the Receiver Estates, without the agreement of the Receiver; and

D.   Doing any act to interfere with the taking control, possession, or management, by the Receiver, of any assets of the Receiver Estates, or to in any way interfere with or harass the Receiver, or to interfere in any manner with the exclusive jurisdiction of this Court over the Receiver Estates.

## VIII.

From time to time, upon application of the Receiver, the Court shall reissue this Order and upon applications of the Receiver may amend this Order.

## IX.

All persons, and all others acting on behalf of any such persons, including sheriffs, marshals, other officers, deputies, servants, agents, employees and attorneys, are ordered to turn over to the Receiver any and all property, including records of any nature, of which any of the Receiver Estates are the owners or have an interest in immediately upon receiving notice of the entry of this Order.

## X.

No person holding or claiming any position of any sort with any of the Receiver Estates shall possess any authority to act by or on behalf of any of the Receiver Estates.

## XI.

No shareholders, partners, members, or trustees of any of corporations, partnerships, limited liability companies, or trusts that are among the Receiver Estates shall exercise any of their rights or powers with respect to the Receiver Estates until further order of the Court.

## XII.

The Defendants, Entity Relief Defendants, and Individual Relief Defendants as well as their agents, servants, employees, attorneys, any persons acting for or on behalf of the Receiver Estates, and any persons receiving notice of this order by personal service or otherwise, are hereby restrained and enjoined from disposing, transferring, exchanging, assigning or in any way conveying any property or assets of the Receiver Estates and from the transaction of any business of the Receiver Estates except with the approval of the Receiver.

## XIII.

The Defendants, Entity Relief Defendants, and Individual Relief Defendants, as well as their agents, servants, employees, attorneys, any persons acting for or on behalf of the Receiver Estates, and any persons receiving notice of this order by personal service or otherwise, having possession of the property, business, books, records, accounts or assets of the Receiver Estates are hereby directed to deliver the same to the Receiver, his agents and/or employees. However, nothing in this paragraph shall impinge on a person's rights to assert any applicable privilege.

## XIV.

The Defendants, Entity Relief Defendants, and Individual Relief Defendants, their agents, servants, employees, nominees, attorneys and entities under their direct or indirect

control shall cooperate with and assist the Receiver and shall take no action, directly or indirectly, to hinder, obstruct, or otherwise interfere with the Receiver, in the performance of his duties.

**XV.**

Any brokerage institution, financial institution, bank, savings and loan, mutual fund, or any other person, partnership, or corporation maintaining or having custody or control of any brokerage or deposit account or other assets of any of the Receiver Estates or under their control, that receives actual notice of this order by personal service, facsimile transmission or otherwise shall, within three (3) business days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the Commission a certified statement setting forth, with respect to each such account or other asset, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice.

**XVI.**

The Receiver shall be empowered, but is not required, to file voluntary petitions for relief under Title 11 of the United States Code (the Bankruptcy Code) for the Receiver Estates. If a bankruptcy petition is filed, the Receiver shall become, and shall be empowered to operate each of the Receiver Estates as a debtor in possession. The Receiver shall have all of the powers and duties as provided a debtor in possession under the Bankruptcy Code to the exclusion of any other person or entity. Should the Receiver elect to file petitions under Title 11 of the United States Code for any of the Receiver Estates, he shall have 15 days from the date of such filing to file with the Bankruptcy Court any lists or schedules required to be filed with such petitions, this Court recognizing that the Receiver will require time to assemble such data for filing.

8

## XVII.

The Receiver is authorized to communicate with all such persons as he deems appropriate to inform them of the status of this matter and the financial condition of the Receiver Estates. The Receiver is further authorized to record this Order with government offices and to serve this Order on any person as he deems appropriate in furtherance of his responsibilities in this matter. All government offices which maintain public files of security interests in real and personal property are hereby ordered to record this Order when requested to do so by the Receiver or the Commission.

## XVIII.

The Receiver shall promptly notify the Court and counsel for the Commission of any failure or apparent failure of the Defendants, Entity Relief Defendants, and Individual Relief Defendants to comply in any way with the terms of this Order.

**SO ORDERED.**

Dated: 5/5/08
(@ 4:40 PM)

HONORABLE PAUL V. GADOLA
UNITED STATES DISTRICT JUDGE

---

### Certificate of Service

I hereby certify that on _____ , I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: _____

A TRUE COPY
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

BY _____
DEPUTY CLERK

Ruth A Brissaud, Case Manager
(810) 341-7845

9



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

    v.

GREGORY N. McKNIGHT, and
LEGISI HOLDINGS, LLC,

        Defendants,

    and

LEGISI MARKETING, INC., LIDO
CONSULTING, LLC
HEALTHY BODY NUTRACEUTICALS,
LINDENWOOD ENTERPRISES. LLC,
DANIELLE BURTON, THERESA
BURTON, and JENNIFER MCKNIGHT,

        Relief Defendants.

Case: 4.08-cv-11887
Judge: Gadola, Paul V
MJ: Morgan, Virginia M
Filed: 05-05-2008 At 12.06 PM
CMP POSSIBLE SEALED MATTER (TAM)

## COMPLAINT

Plaintiff, Securities and Exchange Commission ("Commission"). alleges and states as follows:

### SUMMARY

1.      Defendant Gregory N. McKnight ("McKnight") is a resident of Swartz Creek, Michigan.  Defendant Legisi Holdings, LLC ("Legisi Holdings") is a shell company chartered in the bank-secrecy haven of Nevis in the West Indies.  McKnight controls Legisi Holdings.

**FILED**

MAY 14 2008

Clerk, U.S. District and
Bankruptcy Courts

08-mc-307

2.          Prior to the events described herein, in around December 2005, McKnight owed $11,184 on his VISA Gold credit card. His bank accounts were overdrawn by $156.

3.          In December 2005, McKnight and Legisi Holdings began offering and selling interests in a pooled investment program variously called Legisi.com or Legisi ("the Legisi program"). McKnight promoted the offering around the globe through an Internet website at www.legisi.com ("the Legisi website"). From December 2005 through at least November 2007, the Defendants raised approximately $72 million from 3,000 to 4,000 members of the public. The 3,000 to 4,000 persons who invested in McKnight's scheme ("Legisi investors") reside in all 50 states and several foreign countries.

4.          McKnight, on behalf of Legisi Holdings and himself, raised money based on promises that he would invest the offering proceeds and then pay the investors each month, which payments would be funded with profits from his investments. On the Legisi website, and in conversations with investors, McKnight represented that his investing activities consistently generated monthly profits ranging from 15 percent to 18 percent. From those purported profits, McKnight promised to pay his investors returns of as much as 15 percent per month. McKnight also represented that he set aside 10% percent of all his investing profits each month to create a reserve fund for the benefit of the Legisi investors. McKnight claimed that he would put profits into the supposed reserve fund until it totaled 110% of the total investors' principal that Legisi received.

5.          McKnight's representations to investors and potential investors were false. Of the approximately $72 million that McKnight raised from Legisi investors, he invested, net of withdrawals, only about $33 million. And, far from being the wild success that McKnight

2

portrayed to the Legisi investors, his investments in fact generated significant losses. All together, McKnight has realized losses totaling approximately $3.6 million on the investments he made with the Legisi investors' money.

6.        McKnight diverted the remaining $39 million of the offering proceeds for his own benefit. In the manner of a classic Ponzi scheme, he used approximately $27.5 million of the offering proceeds to make payments of purported profits to Legisi investors. McKnight used another $2.2 million of the offering proceeds to pay personal expenses, including at least $218,919 on motor vehicles, at least $190,682 in payments to or for the benefit of family members, at least $124,215 for home repairs and renovations, at least $108,311 for vacations and travel, at least $102,024 to pay credit card bills, and sent at least $144,000 in total to his daughter, Jennifer McKnight, his niece Danielle Burton, and to Danielle Burton's mother Theresa Burton.

7.        During the Legisi offering–when the Defendants took in approximately $72 million from Legisi investors–the Defendants and Relief Defendants Legisi Marketing, Inc., Lido Consulting, LLC, Healthy Body Nutraceuticals, and Lindenwood Enterprises, LLC ("Entity Relief Defendants") received a total of only about $130,000 from other sources.

8.        In May 2007, McKnight was interviewed by law enforcement agents. Within hours of the interview, an announcement appeared on the Legisi website stating that the Legisi program was closed to new investors, effective immediately, and representing that Legisi had to close that afternoon because of a "massive influx" of new investors. McKnight also cut off access to the Legisi website by the public by requiring a login and password to enter the site.

3

The Defendants appear to have been taking in money from members of the public at least as late as November 2007.

9.          At the present time, McKnight and the Relief Defendants hold assets worth $59 millions dollars.  These assets include stocks, commodity futures and options, cash, and real estate investments in Michigan and Florida.  McKnight acquired these assets with money raised from the Legisi investors.  McKnight possesses control over his and the Entity Relief Defendants' assets and is free to dispose of those assets without warning or notice to anyone.  In addition, over the last seven months, McKnight has transferred at least $525,000 of investor funds to Relief Defendant Lindenwood Enterprises, LLC.  Relief Defendant Danielle Burton has withdrawn at least $75,000 of cash from a bank account containing investor funds.  Further, at least $467,158 has been transferred out of Legisi Marketing's account at LaSalle Bank to unidentified recipients and for unknown reasons.

10.          Through their actions, McKnight and Legisi Holdings have violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77c(c), and 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

## DEFENDANTS

11.          **Gregory N. McKnight** is 48 years old and resides in Swartz Creek, Michigan. McKnight controls Defendant Legisi Holdings and Relief Defendants Legisi Marketing, Inc., Lido Consulting, LLC, Healthy Body Nutraceuticals, and Lindenwood Enterprises, LLC. McKnight is related to the individual Relief Defendants.

4

12.    **Legisi Holdings, LLC** is a Nevis, West Indies limited liability company that McKnight formed in February 2006. Its principal place of business is in Swartz Creek, Michigan. The Legisi website represents that the Legisi program is a wholly owned subsidiary of Legisi Holdings. Legisi Holdings has no apparent business other than to serve as the entity through which McKnight conducted the offering of the Legisi program investment contracts.

## RELIEF DEFENDANTS

13.    **Legisi Marketing, Inc.** ("Legisi Marketing") is a Michigan corporation formed by McKnight in January 2007. Legisi Marketing has its principal place of business in Flint, Michigan. According to its now defunct website, Legisi Marketing is in the business of buying soon-to-be foreclosed properties in Genesee County, Michigan. Beginning in January 2007, McKnight has deposited millions of dollars of Legisi investor funds in bank and brokerage accounts held in the name of Legisi Marketing. McKnight controlled these accounts and used them to make interest and principal payments to Legisi investors, to trade in securities and commodities, and to purchase real estate.

14.    **Lido Consulting, LLC** ("Lido") is a Wyoming limited liability company that McKnight formed in June 2006. Lido has its principal place of business in Swartz Creek, Michigan. Lido has no apparent business other than serving as the account holder for e-currency and brokerage accounts that McKnight controlled. McKnight transferred millions of Legisi investor funds into these accounts and sent funds out of these accounts to Legisi investors.

15.    **Healthy Body Nutraceuticals** ("HBN") is a Michigan limited liability company that McKnight formed in February 2003. HBN has its principal place of business in Swartz Creek, Michigan. McKnight sold nutritional products through HBN prior to commencing his

5

offering of Legisi program investment contracts. During the course of the Legisi program offering, McKnight transferred approximately $800,000 of Legisi investor funds into an account he controlled in the name HBN. Most of these funds were then transferred to an account in McKnight's name.

16.    **Lindenwood Enterprises, LLC** ("Lindenwood") is a Michigan limited liability company formed by McKnight in August 2007 that has its principal place of business in Flint, Michigan at the same location as Legisi Marketing. McKnight is listed as the registered agent for Lindenwood which is a shell corporation. In late March 2008, Lindenwood received a check for $100,000 from Legisi Marketing, drawn on a bank account into which investor funds had been deposited.

17.    **Danielle Burton**, age 28, resides in Swartz Creek, Michigan. Danielle Burton is McKnight's niece and the office manager for Legisi Holdings and Legisi Marketing. She has signatory authority on Legisi Marketing's bank accounts. Since the end of February 2008, Danielle Burton has signed and endorsed several checks made out to "cash" in the total amount of at least $75,000. These checks were drawn on a Legisi Marketing bank account into which investor funds had been deposited. She also personally received at least an additional $26,399 in investor funds.

18.    **Theresa Burton**, age 50, resides in Flint, Michigan. Theresa Burton is Danielle Burton's mother. McKnight transferred at least $80,000 in investor funds to Theresa Burton.

19.    **Jennifer McKnight**, age 19, resides in Swartz Creek, Michigan. Jennifer McKnight is Gregory McKnight's daughter. McKnight has transferred at least $38,000 of investor funds from his personal bank accounts to accounts held by Jennifer McKnight.

6

## JURISDICTION

20.         This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§

78u(e) and 78aa]. Venue is proper in this Court pursuant to Section 22(a) of the Securities Act

[15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].

21.         The acts, transactions, practices, and courses of business constituting the

violations alleged herein occurred within the jurisdiction of the United States District Court for

the Eastern District of Michigan and elsewhere.

22.         Defendants, directly and indirectly, have made, and are making, use of the means

and instrumentalities of interstate commerce, the means and instruments of transportation and

communication in interstate commerce, and the mails, in connection with the acts, transactions,

practices, and courses of business alleged herein.

## FACTS

## DEFENDANTS' PUBLIC SOLICITATION OF INVESTORS

23.         From approximately December 2005 through August 2007, Defendants McKnight

and Legisi Holdings have conducted a fraudulent, unregistered offering of investment contracts.

24.         The investment contracts offered and sold by the Defendants were interests in a

pooled investment program called variously Legisi.com or Legisi.

25.         Through their offering, the Defendants raised approximately $72 million from

between 3,000 and 4,000 investors.

26.         The Legisi investors reside in all 50 states and several foreign countries.

7

27.    The Defendants solicited investors around the world through a publicly available Internet website at www.Legisi.com. McKnight controls the Legisi website and is responsible for its content.

28.    McKnight also spoke with investors and prospective investors by telephone and in at least one meeting.

29.    No valid registration statement was filed or was in effect with the Commission in connection with the Defendants' offer and sale of Legisi program investment contracts.

30.    Neither the Defendants nor anyone else on their behalf inquired into the financial status of the Legisi investors. Some Legisi investors had net worths of less than $1 million and/or annual incomes of less than $200,000 at the time they invested in the Legisi program.

31.    Neither the Defendants nor anyone else on their behalf provided the Legisi investors with any financial information about themselves or the Legisi program.

32.    The Defendants asserted on the Legisi website that the Legisi program was merely a "loan program" through which investors would "loan" money to Legisi and, in return, Legisi would pay investors high rates of interest.

33.    In fact, however, the Legisi program was a classic pooled investment vehicle, in which investors invested money into a common venture with the expectation that the money would be used to generate profits, for the Defendants and the investors, solely through the efforts of McKnight.

34.    The Defendants offered several investment options on the Legisi website. One option was the 30-day, "Tester Fund" with a $20 minimum principal investment which was to

8

pay .25% interest per day. Another option was the one-year, "V.I.P. Fund" with a $5,000 minimum principal investment which was to pay 15% interest per month.

35.     To invest, an investor had to join the Legisi program by completing a membership form on the Legisi website, chose a Legisi investment option, and set up an account with an electronic currency ("e-currency") provider.

36.     By way of example, one e-currency provider utilized by the Defendants is E-gold, a Nevis-chartered Internet depository that maintained accounts on behalf of McKnight and Legisi investors. Investors who wished to invest in the Legisi program deposited money via a credit card transaction or wire transfer into their E-gold accounts. E-gold, in turn, transferred equivalent sums (in U.S. dollar denominated amounts) via the Internet, to E-gold accounts controlled by McKnight. McKnight maintained and controlled e-currency accounts in his name and in the names of the entities he controlled, including Legisi Holdings, Lido, and HBN.

37.     The Defendants did not maintain separate accounts for each Legisi investor. Rather, the Defendants pooled the Legisi investors' funds in the e-currency accounts that McKnight controlled.

38.     After an investor transferred money into the Legisi program, the Defendants sent an email to the investor confirming the transfer amount, the investor's Legisi account number, the name of the investment option chosen by the investor, and the investor's rate of return.

39.     Legisi investors did not receive a promissory note or any form of "loan" documentation.

40.     The Defendants offered Legisi investors the choice either to reinvest the interest they earned on their investments or to receive an interest payment each month.

9

41.        The majority of Legisi investors chose to reinvest their interest in the Legisi program.

42.        As a result of the Defendants' early consistent payments of interest and return of principal, many investors purchased new investments and recommended the Legisi program to their family, friends, and co-workers.

43.        The Defendants paid investors a commission for each new investor they referred. The commission initially was $40 per referral and then was increased to 5% of the amount invested by the referred investor.

### DEFENDANTS' MISREPRESENTATIONS AND MISLEADING OMISSIONS

44.        Throughout the period from December 2005 through at least October 2007, McKnight, on behalf of himself and Legisi Holdings, misrepresented material facts and misleadingly omitted to disclose material facts in communications to investors and prospective investors. McKnight made these misrepresentations and materially misleading omissions on the Legisi website, in conversations with investors, and on at least one other website.

45.        The Legisi website also included a "Forum" on which Legisi investors could pose questions or discuss issues regarding the Legisi program. McKnight and several Forum "moderators" posted information and updates on the Forum, including reports on the amount of money investors sent to and withdrew from Legisi. McKnight and the Forum moderators also posted answers to questions from investors. On December 24, 2006, McKnight made a post on the Forum stating that he oversaw the Forum and that the moderators spoke on his authority. McKnight's December 24, 2006 posting remained on the Forum until at least June 2007.

10

46.      Like McKnight, the Forum moderators misrepresented material facts and misleadingly omitted to disclose material facts. McKnight's and the Forum moderators' misrepresentations and misleading omissions concerned, among other things, the use McKnight would make of offering proceeds, the profitability of investments in the Legisi program, the losses he incurred with the investors' funds, the true sources of the money he paid out to investors, and the legitimacy and safety of investments in the Legisi program.

### Use of Offering Proceeds

47.      McKnight, on behalf of himself and Legisi Holdings, represented that he invested Legisi investor funds in various investment vehicles, including foreign currencies, commodity futures, stocks, and real estate.

48.      In fact, however, of the approximately $72 million that the Defendants raised from Legisi investors, McKnight only used a net of approximately $33 million to make the promised investments.

49.      For the first five months of the Defendants' offering, McKnight invested only about $181,000 of the Legisi investors' money. However, he did not invest these funds as he had represented. Rather, he put the $181,000 into three dubious offerings of the type commonly known as high yield investment programs or HYIPs. Only $88,000 of the funds McKnight transferred to the HYIPs was ever returned, resulting in a loss of approximately $94,000.

50.      Eight months after the Defendants began their offering, in August 2006, McKnight began investing in foreign currencies. Four months later, in December 2006, he began investing in commodity futures. From August 2006 through August 2007, McKnight invested approximately $11.7 million of investor funds in foreign currencies, commodity futures,

11

and options on commodity futures. From August 2006 through April 9, 2008, McKnight suffered realized of approximately $3.6 million on these investments.

51.        From January 2007 through May 2007, McKnight used approximately $11.2 million to purchase real estate investments through Relief Defendant Legisi Marketing. To date, McKnight appears to have received only a de minimus amount of income from these investments.

52.        From March 2007 through August 2007, McKnight, through Relief Defendant Legisi Marketing, used approximately $12.3 million of investor funds to purchase millions of restricted shares and warrants of three thinly-traded over-the-counter ("OTC") stocks and one privately held company. Also in August 2007, McKnight, through Relief Defendant Legisi Marketing, used approximately $3.9 million of investor funds to acquire four promissory notes issued by a privately held shutter and screen door company. McKnight has not realized any gains or losses from these investments. McKnight's positions in the stock of the private company and the promissory notes are illiquid and have no current market value. McKnight's positions in two of the OTC stocks have incurred unrealized losses. His position in the third OTC stock has incurred unrealized gains. Over the last several weeks McKnight's positions in the three OTC stocks, held through Relief Defendant Legisi Marketing, have fluctuated between $32.4 million and $39.8 million. However, all three of the OTC stocks are thinly traded and their prices have been volatile; the prices for which these stocks could be liquidated are uncertain.

53.        McKnight diverted at least $27 million of Legisi investors' money to pay purported interest to other Legisi investors, to return principal to other Legisi investors, and to

12

pay commissions to Legisi investors who referred other investors to Legisi.  That is, McKnight operated the Legisi program as a Ponzi scheme.

54.        McKnight also converted about $ 2.2 million of the investors' money to pay his personal expenses; and McKnight secretly transferred at least $144,000 of the Legisi offering proceeds to Relief Defendants Danielle Burton, Theresa Burton, and Jennifer McKnight. McKnight also transferred at least $525,000 to Relief Defendant Lindenwood.  The Defendants did not disclose these diversions of investor funds.

55.        McKnight used the remainder of the Legisi investors' money for a variety of purposes, including to pay the costs of the marketing of the Legisi program.  The Defendants did not disclose this use of investor funds to investors.

### Profitability of Investments in Legisi

56.        McKnight misrepresented that the investments he made with the investors' money were profitable.

57.        Between December 2005 and May 2006, the Legisi website stated that "profits from these investments . . . are used to enhance our program(s) and increase stability for the long term."

58.        The investment choices listed on the Legisi website varied throughout the life of the Legisi program, with the offered interest rates ranging from .25% a day to 15% per month, to be paid from the profits generated by McKnight's investments.

59.        In January 2007, McKnight wrote on the Legisi Forum that "Legisi Holdings is simply a company that currently wants to borrow your money and re-pay you with a handsome interest rate.  Obviously, we make money from your money.  That['s] why we're in business."

60.        Between December 2005 and the first half of October 2007, McKnight represented to investors who chose to reinvest their investments that they had earned the interest each month that he had promised to pay them.

61.        In or about March 2007, McKnight told an investor in a telephone call that Legisi was successful in the foreign currency market. McKnight also told the investor that the profits generated from Legisi's foreign currency and other investments would pay the interest the investor was to receive.

62.        In May 2007, he wrote on the Legisi website, "our members loan us funds, choose their repayment terms and enjoy the interest payments. The sole purpose of Legisi Holdings, LLC is to profit more than we pay out in interest. We have been extremely successfu at that since December 28, 2005."

63.        McKnight also told undercover law enforcement agents in May 2007 that "a really good month is 18%...the average month is 16%" in profits.

64.        In January 2007, McKnight informed Legisi investors that the Legisi program would be closed to new investors in May or June 2007. McKnight explained that the Legisi program's investments in foreign currency and commodities were extremely profitable, but were volatile, and he wanted to move investor funds into more conservative investments. McKnight represented that once the Legisi program had been closed to new members, the interest rate for new "loans" would be reduced to 6% per month, though existing "loans" would continue to pay interest at their current rates. This limited time offer to continue to invest in the Legisi program at the higher interest rates attracted a significant number of additional investments. Between

14

January 2007 and May 2007, the Defendants raised at least an additional $35 million from investors.

65.        In June 2007, a posting on the Legisi website stated that "Legisi makes about 15% a month on the money between Forex, options, warrants, and stocks; sometimes more, sometimes less, but let's just say 15%."

66.        Throughout 2006 and 2007, McKnight posted on the Legisi website each investor's "account history," which listed the amount of interest that the investor had purportedly earned each month and the total value of their investment. The posted amount of interest earned always equaled the amount that McKnight promised to pay pursuant to the terms of the investment the investor chose.

67.        McKnight also represented on the Legisi website in May 2006 and June 2007 and in conversations that he was compensated from the difference between the profits earned from these investments and the interest he promised to pay investors each month. In at least May 2006, McKnight wrote, "We are obviously receiving a higher return on our invested funds. We repay our members and keep a small profit for ourselves. Everybody's happy."

68.        In addition, Legisi Forum moderator "Martin" posted on March 17, 2007, "But, in case you are wondering Greg of course has a financial motive to leverage our funds for his personal gain in the long run by taking the difference between what he pays out and what he brings in. I don't know the numbers, but he has to be paying us a huge majority of the earnings back."

69.        McKnight's and the moderators' representations of profitability were all false and misleading.

15

70.        During the period of December 2005 through April 2008, McKnight realized losses of approximately $3.6 million.

71.        The Defendants did not disclose these losses to Legisi investors.

## Sources of Money Paid out to Investors

72.        McKnight represented on the Legisi website that his investments routinely generated a profit of 15 percent to 18 percent each month. McKnight further represented that once he paid the Legisi investors he would keep any remaining profits for himself.

73.        Legisi investors who chose to withdraw their monthly interest payments received them on a timely basis from December 2005 until July 2007.

74.        Likewise, from December 2005 through July 2007, the Defendants paid back the principal of Legisi investors who requested a withdrawal of their funds from the program.

75.        From December 2005 through the first half of October 2007, the Defendants paid out a total of approximately $27 million to Legisi investors.

76.        McKnight, on behalf of himself and Legisi Holdings, represented to investors that their payments were made from investment profits of the Legisi program.

77.        For example, on the Legisi website's "Frequently Asked Questions" page as it appeared in at least May 2006, McKnight answered the question, "How do you pay out such high returns?" by stating, "We are obviously receiving a higher return on our invested funds. We repay our Members and keep a small profit for ourselves. Everybody's happy."

78.        McKnight also told at least one Legisi investor that the interest he would pay the investor would come from the profits that he made in the foreign currency markets and other investments.

16

79.         McKnight also stated on the Legisi Forum that: "I am looking to diversify our holdings into some much more stable elements. While our Commodities Options and Forex Positions have been extremely profitable, they are also very volatile and may become mores so as we grow larger. Diversifying a large part of our funds into lower risk instruments will mean lower profits and therefore lower rates but it also means much greater longevity and less stress on me."

80.         McKnight also stated on the Legisi Forum that: "As we diversify our holdings to slightly more conservative situations, our profit margin will shrink. We will no longer desire to borrow at 10 – 12.5%."

81.         The representations described in paragraphs 72 through 80 above were false.

82.         In fact, McKnight funded his payments to Legisi investors with money obtained from other investors. In other words, he operated a classic Ponzi scheme.

83.         The Defendants did not disclose that the money paid out to Legisi investors, rather than constituting investment profits, was funded by money obtained from other Legisi investors.

## The Legitimacy and Safety of Investments in Legisi

84.         McKnight also misrepresented the legitimacy of the Legisi program and the safety of the Legisi investments.

85.         McKnight represented on the Legisi website from December 2005 to at least May 2006 that investors could trust their money with Legisi because "we will never resort to paying out earnings from 'new money' like the filthy scamming HYIPs." In at least May 2007, McKnight represented on the Legisi website that, "We do not offer ridiculously high interest

rates. We leave that to the scam artists. One of our goals is to put these scammers out of business. Drive 'em right off the 'Net!"

86.      He further represented that Legisi was a legitimate program designed to put out of business the HYIPs and Ponzi schemes that "disappear with all your money."

87.      In a November 6, 2006 on-line interview about Legisi on a different website, McKnight stated that he started Legisi because, "With the extremely large number of scams on the Internet today, I saw an amazing opportunity for someone with the right knowledge and connections to step forward and create an honest, legitimate program."

88.      These statements were false, because McKnight was operating a Ponzi scheme by using new investor funds to pay interest to other investors and was misappropriating investor funds for his own use.

89.      McKnight also represented on the Legisi website that Legisi had a "Reserve Account" in which he would place 10% of his trading profits until the account's balance equaled 110% of the total investors' principal that Legisi received. McKnight represented that he set up this account to protect investors should Legisi's investments not generate sufficient profits in any given month.

90.      McKnight told undercover law enforcement agents in May 2007 that he set aside 10% per month in a reserve account in the event he is not able to pay investors what he owes them, the reserve account's balance was approximately $8 million, and that he had not had to withdraw any funds from the reserve account.

91.      In May 2007, on the Legisi Forum, on which Legisi investors posted information and asked questions about the Legisi program, McKnight stated that Legisi had more than

18

enough in its reserves to completely cover the funds frozen in his E-gold accounts as a result of a court order in a separate government action.

92.    These statements were false. McKnight had never created a Reserve Account and did not set aside for the Legisi investors any profits.

## MCKNIGHT ACTED TO CONCEAL HIS OFFERING OF SECURITIES

93.    The Legisi website was available to the general public from the inception of the Legisi program in December 2005 until on or about May 17, 2007.

94.    On May 17, 2007, two law enforcement agents interviewed McKnight about the Legisi offering.

95.    Within hours of the interview, an announcement appeared on the Legisi website stating that the Legisi program was closed to new investors, effective immediately. McKnight also cut off access to the Legisi website by the public by requiring a login and password to enter the site.

96.    In August 2007, the Defendants stopped taking in money through e-currency providers. Beginning in around September 2007, investors requested but did not receive withdrawals of their funds.

97.    In October 2007, the Legisi website was taken down.

98.    The Defendants continued to receive money from members of the public at least through November 2007.

19

## MCKNIGHT AND HIS COMPANIES CONTROL MILLIONS
## IN ASSETS ACQUIRED WITH OFFERING PROCEEDS

99.        McKnight is still in control of millions of dollars of assets acquired with investor

funds, including securities, commodity futures positions, options positions, foreign currency

positions, and real estate investments. Many of these assets are held in the names of Relief

Defendant Legisi Marketing.

100.       As of April 9, 2008, McKnight, through Legisi Marketing, controlled three

brokerage accounts containing foreign currency options and futures and commodities options

and futures positions with an aggregate net liquidating value of approximately $1.3 million.

101.       As of April 21, 2008, McKnight, through Legisi Marketing, also held

approximately $105,000 in several bank accounts.

102.       McKnight, through Legisi Marketing, currently owns ten pieces of real estate in

Genesee County, which Legisi Marketing purchased with approximately $1.2 million of investor

funds.

103.       McKnight, through Legisi Marketing, used approximately $9.3 million of investor

funds to purchase an interest in a Florida real estate venture, which he currently still has.

104.       McKnight, through Legisi Marketing, also controls several million shares of

thinly-traded stocks that may be worth millions.

105.       Included in the stock holdings of Legisi Marketing are approximately 1.7 million

shares of the restricted stock of an issuer named Pacific Asia Petroleum, Inc ("Pacific Asia").

The stock of Pacific Asia is quoted on the Pink OTC Market.

20

106.        The restrictions on the Pacific Asia stock will expire on May 7, 2008, enabling

McKnight to begin selling the shares of this stock. The Pacific Asia shares controlled by

McKnight had a total value of $39.8 million as of May 4, 2008.

107.        McKnight holds this stock, as well as two other OTC stocks, in certificate form.

108.        McKnight told investors in November 2007 and February 2008 that he plans to

sell stock, purportedly to repay investors. McKnight called a stock broker on or about April 9,

2008 seeking the broker's assistance in selling shares of other restricted stocks which had

recently become eligible for resale.

109.        McKnight has the ability to sell or to transfer all assets held by Legisi Marketing,

Lido, and HBN, without notice to anyone.

## COUNT I

### Violations of Section 5(a) and (c) of the Securities Act
### [15 U.S.C. § 77e(a) and (c)]

110.        Paragraphs 1 through 109 above are realleged and incorporated herein by

reference.

111.        By their conduct, McKnight and Legisi Holdings, directly or indirectly: (i) made

use of means or instruments of transportation or communication in interstate commerce or of the

mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no

registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or

caused to be carried through the mails or in interstate commerce, by any means or instruments of

transportation, securities as to which no registration statement was in effect; and (iii) made use of

any means or instruments of transportation or communication in interstate commerce or of the

mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

112.        No valid registration statement was filed or was in effect with the Commission in connection with McKnight's and Legisi Holdings's offer and sale of securities in the Legisi program.

113.        By reason of the foregoing, McKnight and Legisi Holdings have violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

### COUNT II

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

114.        Paragraphs 1 through 109 above are realleged and incorporated herein by reference.

115.        By their conduct, McKnight and Legisi Holdings, in the offer or sale of securities in the Legisi program, by the use of any means or instruments of transportation or communication in interstate commerce and by the use of the mails, directly or indirectly, have employed devices, schemes or artifices to defraud.

116.        McKnight and Legisi Holdings acted with scienter.

117.        By reason of the foregoing, McKnight and Legisi Holdings violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

22

## COUNT III

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

118.        Paragraphs 1 through 109 above are realleged and incorporated herein by reference.

119.        By their conduct, McKnight and Legisi Holdings, in the offer or sale of securities in the Legisi program, by the use of any means or instruments of transportation and communication in interstate commerce and by the use of the mails, directly or indirectly, have obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or have engaged in transactions, practices or courses of business which have been operating as a fraud or deceit upon purchasers of securities in the Legisi program.

120.        By reason of the foregoing, McKnight and Legisi Holdings violated Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT IV

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5
### Thereunder
### [17 C.F.R. § 240.10b-5]

121.        Paragraphs 1 through 109 above are realleged and incorporated herein by reference.

122.        By their conduct, McKnight and Legisi Holdings, in connection with the purchase or sale of securities in the Legisi program, by the use of any means or instrumentalities of

23

interstate commerce or by the use of the mails, directly or indirectly: (a) employed a device, scheme or artifice to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in an act, practice, or course of business which has been or is operating as a fraud or deceit upon other persons, including purchasers and sellers of such securities.

123.      McKnight and Legisi Holdings acted with scienter.

124.      By reason of the foregoing, McKnight and Legisi Holdings have violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## COUNT V

### Relief Defendants

125.      Paragraphs 1 through 124 above are realleged and incorporated herein by reference.

126.      Altogether, the Defendants received approximately $72 million of ill gotten funds through their illegal offering of securities.

127.      The Defendants transferred millions of dollars in offering proceeds to the Relief Defendants.

128.      Legisi Marketing received millions in Legisi investor funds. It currently holds assets worth approximately $59 million, which assets were acquired with offering proceeds raised by the Defendants.

24

129.        Lido received millions of the offering proceeds raised by the Defendants. Some of these funds were later transferred to Legisi Marketing.

130.        HBN received approximately $800,000 of the offering proceeds raised by the Defendants. Some of these funds were later transferred to McKnight's personal e-Bullion account, while approximately $55,000 was used to pay a debit card balance.

131.        Lindenwood received at least $525,000 of the offering proceeds raised by the Defendants.

132.        Danielle Burton received at least $26,850 of the offering proceeds raised by the Defendants.

133.        Theresa Burton received at least $80,000 of the offering proceeds raised by the Defendants.

134.        Jennifer McKnight received at least $38,000 of the offering proceeds raised by the Defendants.

135.        The offering proceeds the Relief Defendants received from the Defendants constituted ill-gotten gains.

136.        The Relief Defendants have no legitimate claim to the ill-gotten funds they received from the Defendants or to any assets that the Relief Defendants acquired with those ill-gotten funds.

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that the Court:

Issue findings of fact and conclusions of law that the Defendants committed the violations charged and alleged herein.

25

Issue Preliminary and Permanent Injunctions restraining the Defendants, their officers, agents, servants, employees, attorneys, and all person in active concert or participation with them, and each of them, from violating and from aiding and abetting violations of: (a) Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77c(c)]; (b) Sections 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. §§77q(a)(1), (2) and (3)]; and (c) Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]; and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

Order the Defendants and Relief Defendants to pay disgorgement of their ill-gotten gains, derived directly or indirectly from the conduct complained of herein, together with prejudgment interest thereon.

Order the Defendants to pay to the Commission civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and to carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of the Court.

Grant an Order for such further relief as the Court may deem appropriate.

Respectfully submitted,

DATED: May 5, 2008

JOHN E. BIRKENHEIER
STEVEN L. KLAWANS

26

JAMES G. O'KEEFE
Attorneys for Plaintiff
U.S. SECURITIES AND
175 West Jackson Boulevard, Suite 900
Chicago, Illinois 60604
Telephone: (312) 886-3947 (Birkenheier)
Telephone: (312) 886-1738 (Klawans)
Telephone: (312) 886-2239 (O'Keefe)
Facsimile: (312) 353-7398
E-mail: BirkenheierJ@sec.gov
E-mail: KlawansS@sec.gov
E-mail: OkeefeJ@sec.gov

LOCAL COUNSEL
s/ with consent of Ellen Christensen
ELLEN CHRISTENSEN
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
Telephone: (312) 226-9100
Facsimile: (312) 226-2311

%JS 44  (Rev. 12/07)    CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
United States Securities and Exchange Commission

**DEFENDANTS**
Gregory N. McKnight; Legisi Holdings; Relief Defendants: Legisi Marketing, Lido Consulting, Healthy Body Nutraceuticals, Lindenwood Enterprises, Danielle Burton, Theresa Burton, Jennifer McKnight

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Genesee
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
John E. Birkenheier, Steven L. Klawans, James G. O'Keefe, Securities and Exchange Commission, 175 West Jackson Blvd., Suite 900, Chicago, IL 60604, 312.886.3947 (Birkenheier)

Attorneys (If Known)
Richard A. Roth, 545 5th Ave, Suite 960, New York, NY 10016, 212.542.8882.
M. Allen Robb, 1289 S. Linden Road, Suite B, Flint, MI 48532, 810.230.1415.

## II. BASIS OF JURISDICTION    (Place an "X" in One Box Only)

☒ 1  U.S. Government Plaintiff

☐ 2  U.S. Government Defendant

☐ 3  Federal Question (U.S. Government Not a Party)

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)    and One Box for Defendant)

|  | PTF | DEF |
| Citizen of Th...|  |  |
| Citizen of An...|  |  |
| Citizen or Sub...|  |  |
| Foreign Co... |  |  |

Case: 4:08-cv-11887
Judge: Gadola, Paul V
MJ. Morgan, Virginia M
Filed: 05-05-2008 At 12:06 PM
CMP POSSIBLE SEALED MATTER (TAM)

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability |  | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other |  | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability |  |  | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise |  |  | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | **IMMIGRATION** |  | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 462 Naturalization Application |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee |  |  |
|  |  |  | ☐ 465 Other Immigration Actions |  |  |

850

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. 77e, 77q(a), 15 U.S.C. 78j(b).
Brief description of cause:
Defendants conducted fraudulent, unregistered securities offering; illegally obtained funds were transferred to Relief Defendants.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____    CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions)    JUDGE _____    DOCKET NUMBER _____

DATE    May 3, 2008

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____    AMOUNT_____    APPLYING IFP_____    JUDGE_____    MAG JUDGE_____

PURSUANT TO LOCAL RULE 83.11

1.        Is this a case that has been previously dismissed?                    ☐ Yes
                                                                                ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____


2.        Other than stated above, are there any pending or previously        ☒ Yes
          discontinued or dismissed companion cases in this or any other      ☐ No
          court, including state court? (Companion cases are matters in which
          it appears substantially similar evidence will be offered or the same
          or related parties are present and the cases arise out of the same
          transaction or occurrence.)

If yes, give the following information:

Court:   Seventh Judicial Circuit Court of Genesee County

Case No.:   08-87974-CK

Judge: _____


Notes : _____